May it please the Court, my name is Michael Gordon. I am the Assistant Federal Public Defender who represented the juvenile below and is representing the juvenile here before this Court. With the Court's permission, I'd like to reserve two minutes for rebuttal argument. Your Honors, I think this is a case of whether we're going to let, or in fact you're going to let, law enforcement just talk the talk and not walk the walk. And by that little pithy statement, I simply mean to say they almost solely rely on the argument that Agent Robles' statement to the juvenile in this case that you're not in custody was enough to take him out of the custodial status that they had placed him in when they arrived at his house. Now, let me just backtrack for a moment and review the facts and review the factors that the Court's been directed to look at by previous holdings and by the U.S. Supreme Court in determining whether a person's in custody for Miranda purposes. The first factor is the language used obviously summons the defendant. In order, how do you, how do they get a hold of the defendant? Here we know that Agent Robles stood out front and knocked on the door while he sent Investigator Begay around back just in case the defendant were to run out the back door. That in itself is, in my view, a sign of a custodial intent and a custodial status. Second, when he knocked on the door, an underage juvenile around the age of 13 answered the door. He saw someone move the curtains up front, assumed it was the defendant, and the underage juvenile said the defendant was not home. The juvenile was not home. Not believing him, he said to the juvenile, the 13-year-old, look, I know someone's up there. If he's up there, he should come down. It was an order from law enforcement. And he did come down at the direction of law enforcement. When he came downstairs at the direction of law enforcement, I think it was quickly ascertained that he was a juvenile. Agent Robles then directed him to the car. Agent Robles and the government and Investigator Begay takes the position that he got into the car willingly. But when you look at the record, at the excerpt of record, page 37, it specifically says, when I asked him how you know he went into it willingly, all he said is, well, he didn't run off and he didn't say no. Judge, that's not, in my view, getting into the car necessarily willingly. Well, they asked him if he would be willing to talk to them, and he said yes. At the very beginning, yes. He said yes. Well, and they said later, too. They said, are you still willing to talk to us? And he said yes. Right. Right. And they say, and I believe that one of the agents, Begay, said, and we asked if he'd be willing to come to the car, and he said yes. And we told him you're free. We told him you're not under arrest and we won't arrest you. We won't arrest you. We won't take you into custody now, period. The question is whether. That is true, isn't it, right? Yeah, and that's why I started off, Judge, by saying the question is whether they're going to. I thought they said to him that you're free to go after we complete the interrogation. Right. What does that mean about his freedom to go until the time he either confesses or does what they are through with his questioning? Was he free to go? I think implicit in that statement, Your Honors, is the fact that he's not free to go. Well, he's already said, I'm willing to talk to you. He still told them that twice. And they say, well, when we're finished talking, you're free to go. But you have to look at when he. What are they supposed to say to him? You're free to go this moment, I suppose they say. He's already said, I'm willing to talk to you. They say, when you're finished, you can go. Well, Judge, with all due respect, Agent Roble testified that he only mentioned the subject matter about which he was going to talk to him after taking him for the ride. When he asked him up front whether he was willing to talk to him, all the question was, are you willing to speak with me? That's it. When they got back? When they got back. Right. After taking him for the ride, they asked him again if he was still willing to talk. And he said yes. Yes. And it was only at that point he said, well, then, obviously, you're free to go after at no point we're not going to place you under arrest. You're going to be free to go after we speak with you. Let's talk. And you have to. He said earlier on you're not going to be placed under arrest. Well, he said. You're going to be gay. Yeah, but he didn't, at that point, he didn't identify even the subject matter he was going to talk to him about. But he wasn't under arrest. He was told that. You're not being arrested and we won't arrest you. No matter what you say, we won't arrest you. What is a man to think when he has a law enforcement officer placed out back, when he's told he better come downstairs, when he's escorted into a locked car, when he's asked to put on a seat belt, when he's told we're going to go look for your mother with your help, obviously, when then he's carted around town. He goes to the post office. He goes to a residential area. They can't find mom. It becomes very obvious when they get back to the house, they're going to question him with or without mom's presence. And he's not free to go, not free to leave their custody until he answers their questions. That's correct. And the difficulty with the concept here is that what we're dealing with is the totality of the circumstances, and the totality of the circumstances strongly suggests that he was in custody throughout that entire process. And although this Court held it to be just one factor, law enforcement's mental state of mind, what they intended to do is a factor, because that obviously can be projected and understood by the suspect as well. And that was a case cited by the government, United States v. Booth. And they obviously were looking for the mother for a reason. They stated it was just courtesy, but we know that Section 5033 requires them to tell the defendant's mother, rather, or custodian or father that we've taken him into custody and to advise them of the Miranda rights so they can assist the juvenile during the interrogation process. And that's exactly what Agent Robel testified he would have done. He would have followed the Federal 5033 statute and requirements had he found mom. Then when he's unable to find mom, he tries to undo what he's already done by saying, well, we're not going to place you under arrest after we're done with this interrogation. Do you want to still talk to us? Then he identifies the subject matter, and then he speaks. Under those circumstances, I would suggest to you, Your Honors, that this is a case where he clearly was in custody. And an interesting part of this case in reviewing the case law and in reviewing the factors is that many of the cases, most of the cases, in fact, are pre-2002 cases. And this Court's standard of review prior to 2002 was different. United States v. Kim identified a new standard of review as enunciated by the Supreme Court prior to 2002. When you were looking at these cases, you were to review simply for clear error. Was the district court's error, was there clearly erroneous? And now you're to look at the issue de novo, although the factual findings certainly are reviewed under the clearly erroneous standard. You know, by the way, as to when they told him what they wanted to talk to him about, according to Agent Begay, they told him that up front before he even got to the car. I've looked at that part of the record very carefully, Judge. Well, okay. They're at the house now. Did the defendant indicate in some manner he was willing to be interviewed? Yes. When did he do that? After he explained to him why we were there, told him we wanted to talk to him about the incident, and he said, yes, he was willing to talk to us. Then we have an inconsistency in the testimony, because if you look at page 47. Well, if there's inconsistency, we already have a decision by the district judge, don't we? So we're not going to overturn the district judge's determination that it was okay, are we? We can't say that the facts don't support that decision, can we? But Agent Begay says it was Agent Robel who said it, and Agent Robel is the one who wrote the report, and Agent Robel is the one who testified. When asked specifically by the U.S. attorney in this case, when did you first tell him the subject matter about what you wanted to talk about, he says, when we were at the car, when we had come back, and when we were just about to interrogate him. I hear you. That's his memory. The other agent's memory is different. The district judge ---- The district judge made no finding on that fact. Well, he may not have made a specific finding, but I believe we don't then go make our own findings, do we? No, but I don't think that is a dispositive factor in and of itself anyway. Well, you were citing it as being very important that the kid didn't even know why he was at the car. I think it was ---- If that's important, then it just got less important. Well, it may have gotten less important in the sense that there is now somewhat of a conflict in the record. And I'd have to go back and review it, because I remember looking at it and changing my mind whether there was a conflict in the record. Looking at it in context, he seemed to be talking about what was going on up front, and then he was ---- the U.S. attorneys shifted the timeline, and then I couldn't with clarity come to a conclusion as to what he was talking about. Judge, I see that ---- Pretty specific. He says, when did he do it? After the agent explained to him why we were there at his house, he said and told him we wanted to talk to him about ---- Oh, that's why, Judge. That's exactly why I didn't come to a conclusion, why we were there at the house. Were you there just to question him, or were you there to question him about these specific incidents, or were you there ---- Judge, we have a situation where ---- Okay. You see why I didn't come to that conclusion anyway? And I see why the district court didn't come to any conclusion. Right. That could be, too, yes. Good morning. Joan Lufenach of Hearing on behalf of the United States. In this case, the agent who went to the front door told the young man who answered the door, if the defendant was home, that he should just tell him to come out. In response to that, the door closed. There was a short period of time before the defendant came downstairs and came out of the house. The agent asked if he would be willing to talk to them. As the court has already noted, there is some discrepancy as to whether or not he was ---- or there was differing testimony as to whether he was advised immediately or afterwards about the subject matter of the interview. But he asked if he would go to the car and talk to them. He agreed to do that. He got into the front seat. When the agents learned that he was only 16 years old, in order to give the defendant more protection than that to which he was entitled at that point, they asked him where his mother was, if his mother was home. When he said no, that his mother was either at Bashes or the post office, they said, would you come with us to help us look for your mother? And they wanted to find his mother so they could advise her of what they were doing, that they were going to question him, and that what his rights were, that he could have an attorney, right? What Agent Robel said is he wanted to tell the mother that they would like to speak with her son. And then when he was further questioned, he said, I actually don't know exactly what I would have told her. But I probably would have told her. They wanted to get the mother unless they were trying to comply with the statute on the parental role and questioning. Well, I'm sure that they wanted to get the mother in order to comply. However, that's not determinative of whether he was in custody or not. Just because they wanted to provide him with more rights than that to which he was entitled doesn't convert this into a custodial interview. They were willing to get the mother if she was available. But that doesn't mean they took quite a lot of trouble to do something, which you say was a matter of courtesy, I must say. I look at that with some doubt. But it makes a lot of sense of what they want to do is to have him know his rights and then question him. Well, I would submit to the Court that, in essence, to find that by going to look for the mother, I mean, I think that the record supports that they were trying to find the mother in order to make a very clean record. They wanted to do everything that they could. But clean record with a custodial interrogation? But, well, they told him he wasn't. Looks like. I'm sorry? That's what it looks like. They wanted a clean record for a custodial interrogation. And then they became somewhat impatient when they couldn't do it. Well, I disagree. I think that the record supports that they got the boy in the car willingly, that when they learned he was 16, they said, okay, we're going to give you all the protection that we can give you. Can we find your mom? They took reasonable efforts to find the woman. They drove around for a period of time. And only when they couldn't, they said, okay, this is what we want to talk to you about. Are you willing to talk to us? What they should have done was to say, well, we'll wait around. The mother comes back. They were in a hurry, apparently. That may have been the case. And given where the interview took place, I'd submit to the Court that that wasn't an unreasonable thing, if you're at all familiar with the geography of the reservation. You think keeping somebody in a police car in a safety, well, I guess the door's locked. That's not keeping them under control? No. I'd submit that the safety belt was state-locked. The door's locked, aren't they? The door's locked automatically. So I suppose the agent could have unlocked the doors. The agent could have unlocked them. But there's no testimony he did. No, there's no testimony. So he's locked in the car. Right. And he's told you can go after this is over. As counsel said, implicit in that is a statement, you can't go until it's over. But as Judge Fernandez pointed out, he'd already said, I'm willing to talk to you. I know that. He'd said that. But now the agent is telling him, you can go after it's over. It's a very implicit but very clear statement. You can't go. Then it's a temporary detention, and they're entitled to do a temporary detention. How many minutes is a temporary detention? It was at most, well, the testimony was. What's your idea of a temporary detention? I would say 15 minutes would not be unreasonable. But they did at least 30. No, that's not true. What do you mean it's not true? The entire period of time may have been 30 minutes. One agent said the entire period may have been 30. The other said it was 30 to 60. He actually said I think it was 30 to 35, no more than 60. But don't tell me it's not true when the testimony is there. It could well have been up to, what, 50. But not of questioning, though. That's the way I understood it. 15 minutes was an effort to find the mother. It was 15. Correct. All right. So if it was up to 60, it could have been up to 45 minutes of questioning. It could have been. But the testimony appeared to be that it was more likely it was in the range of 30 to 35 minutes, which would have made the interview 15 to 20 minutes. Okay. If 15 minutes would have been temporary, 20 would have been an interrogation. No, I don't think that you can make that kind of distinction. It depends on the give and take during the questioning. The give and take during the questioning was they were accusing him of committing a crime, showing him the evidence, and trying to get him to confess. Well, in showing him the evidence, they pointed to some videotapes. And they told him, children don't lie, she's accused you of this. They accused him of the crime, told him the evidence they had, and tried to get him to confess to change his story. I don't think there's any question about that. I thought the question was whether he was in custody when he was told that he could not leave during the interrogation. Right. But this Court has already held, and I submitted a supplemental authority, that being the Charley case, that telling someone that they're temporarily detained to check out a situation, in this case to conduct the interview, is not in custody. Now, you said that when they went to get the mother, they didn't know why they were going to get the mother. They were just being polite. The officer testified first when they asked, had you been able to contact his mother? You would have advised his mother that Daniel had the right to remain silent. Correct. And had you been able to contact the mother, you would have advised her she had a right to a lawyer before being questioned by you or any law enforcement. I'm not sure what I would have told his mother. I would have basically told his mother I'd like to speak to him. But you would have advised her of his rights, of his rights as required under federal law. Correct. So they would have advised him, her, of his rights, but they decided not to advise him of his rights. Correct, because he had made the decision under the circumstances that he was willing to speak with them. Without knowing what his rights were. Knowing that he was not going to be placed under arrest, that nothing he said would cause him to be placed under arrest. But if he had said I murdered 15 people, they would have said, gee, that's nice. You're not going to be arrested for that. Whatever? Not ever, but during that period of time. Okay. So you're not going to be arrested now. You'll be arrested later on in the day. At some other time. But you are going to be free to go when we're done talking with you. If the whole purpose is to give somebody a chance to know his rights before he confesses, it's a illusory thing to say, well, we won't arrest you at this instant. And then sub-understood, an hour from now we'll come out and arrest you. That's ridiculous. That makes it a mockery of the whole idea of reading people's rights. It doesn't mean that more evidence can't be gathered. No, you're going to use the evidence you get from him and now later come out and arrest him. But it wouldn't necessarily depend on that. Not necessarily. It all depends what he confesses to. It really is difficult to understand why they would have told the mother what his rights are, and then when they couldn't find the mother, why they decided not to tell him what his rights were. Perhaps the better practice would have been, but that doesn't convert this to a custodial. They're trying to understand what it was that why would you tell the mother, go to all this trouble so that you can tell her his rights, and then when you don't find her, not tell him. It's not a question of practice. What's the reason? All I can say is I think they were trying to provide him with more protections than that to which he was entitled, and after he had already told them that I'm willing to talk to you. Well, you said they told him that before they went to go find his mother. Right. And then when they couldn't find her to tell her that he had rights, they still had him to tell him he had rights. Right. And they weren't so anxious then to go beyond their obligation or even to fulfill it. But it's not a very difficult case. It may be difficult to make a decision one way or the other, depending on your view of the law. But, I mean, the issue is pretty clear, I guess. It comes down to the issue of custody. That's correct. And whether what you think of the statements, that you're free to go after you finish your interrogation, what does that mean during the interrogation? And you would say that it's permissible to detain him for the period of the interrogation and that won't constitute custody because it's temporary. Well, and I would submit to the Court that in Charlie, when she – when the woman indicated that she had – I see I'm over my time. Sure. When Mrs. Charlie indicated that something had happened to her children, that they were in the house that was down the road a distance, the police officer said to her, I'm temporarily detaining you to check out the situation. I want to find out what's going on. He put her in the police car in the back and drove her there and then said, may I go in your house to see what's going on? And she said yes. He goes in, discovers the bodies of her children, comes back out again, and at that point places her under arrest and Mirandizes her. And this Court said that that temporary detention of her was not custody during the transportation of her from one location to the other. And I submit that if it wasn't custody in that case, it's not custody in this case. Okay. You say that's in your supplemental letter? Yes. All right. Well, we'll certainly read that. Thank you. Thank you. With the Court's permission, I went over time last time. If I may just have a couple minutes to reply. I will give you a minute. A minute. I will be very, very, very brief then. Number one, Elvira Charlie, and if you look at cases like United States v. Lee, Barron, Panez, United States v. Lee, there's always a distinction of whether the defendant approached law enforcement or whether law enforcement approached the defendant. And in this case, the cases are completely distinguishable on that fact alone. He didn't willingly engage law enforcement. In fact, he was told if he was up there, he should come down. I will point the Court to excerpt pages 13 and 45. Excerpts 13 seem to cryptically say that perhaps he told Agent Robel, told him why we were there, that the allegations were made against him. He doesn't talk about specifically what allegations. When Agent Robel is asked about the allegations, he says, and now he's talking about the time when he returned to the home, and at that time he stated yes, he would. And it was at that time that I told him the questioning, what the questioning was going to be about. So it seems to me the record's more tilted, at least more reasonably read, to mean that he was told the nature of the allegations made against him. But the district court's finding is that he was told why they were there and asked that he would talk about the matter, and he said yes. That's the finding of the district court. All right. That could be. But if you – then I would ask you to find that to be clearly erroneous under the transcript. Okay. But it's not true that the district court did not make a finding. It specifically made that finding. If I misstated that, and I apparently did, Judge, I apologize. All right. Thank you, counsel. Thank you, Judge. Case disargued is submitted. Next case on the calendar for argument is United States – nope, sorry – is Garcia versus Reynolds. Reynolds.
judges: Reinhardt, Noonan, Fernandez